**Nos. 26-2029, 26-2030**

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, LEAGUE OF WOMEN VOTERS LOTTE E. SCHARFMAN MEMORIAL EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEAGUE OF WOMEN VOTERS EDUCATION FUND, ASSOCIATION OF AMERICANS RESIDENT OVERSEAS, U.S. VOTE FOUNDATION, OCA-ASIAN PACIFIC AMERICAN ADVOCATES, DELTA SIGMA THETA SORORITY, INC.,
*Plaintiffs-Appellees*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, UNITED STATES POSTAL SERVICE, UNITED STATES POSTAL SERVICE BOARD OF GOVERNORS, DAVID STEINER, in his official capacity as Postmaster General, DOUGLAS A. TULINO, in his official capacity as Deputy Postmaster General, AMBER F. MCREYNOLDS, in her official capacity as Chairwoman of the Board of Governors of the United States Postal Service, DEREK T. KAN, in his official capacity as the Vice Chairman of the Board of Governors of the United States Postal Service, RONALD A. STROMAN, in his official capacity as a member of the Board of Governors of the United States Postal Service, DANIEL M. TANGHERLINI, in his official capacity as a member of the Board of Governors of the United States Postal Service,
*Defendants-Appellants*,

STATE OF MISSOURI; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA;

STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS,
*Intervenor Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

---

**PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANT-APPELLANTS' MOTIONS FOR STAY PENDING APPEAL**

---

Jessie J. Rossman
Suzanne Schlossberg
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108

Eliza Sweren-Becker
Wendy Weiser
Andrew B. Garber
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271

Justin Lam
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001

Sophia Lin Lakin
Theresa J. Lee
Davin Rosborough
Ethan Herenstein
Jonathan Topaz
Ming Cheung
William Hughes
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Sarah Brannon
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005

Leah C. Aden
Brenda Wright
John S. Cusick
NAACP LEGAL DEFENSE &

Niyati Shah
Noah Baron
Ejaz Baluch, Jr.
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036

Miranda Galindo
Latino Justice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115

EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

I. Sara Rohani
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005

*Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellees League of Women Voters of Massachusetts, League of Women Voters Lotte E. Scharfman Memorial Education Fund, League of Women Voters of the United States, League of Women Voters Education Fund, Association of Americans Resident Overseas, U.S. Vote Foundation, OCA-Asian Pacific American Advocates, and Delta Sigma Theta Sorority, Inc. state that they have no parent corporation and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .................................................. i

INTRODUCTION ......................................................................................... 1

STATEMENT ............................................................................................. 3

A. Executive Order and Final Rule ......................................................... 3

B. Procedural History ............................................................................. 5

ARGUMENT .............................................................................................. 7

I. DEFENDANTS ARE UNLIKELY TO SUCCEED ON THE MERITS. .. 7

A. Plaintiffs May Sue in Equity. ........................................................... 7

B. The Rule Is Unlawful. ........................................................................ 8

C. The Rule Is Unconstitutional. ......................................................... 19

II. THE REMAINING FACTORS WEIGH AGAINST A STAY. ................ 21

A. Defendants Have Not Established Irreparable Harm...................... 21

B. The Equities and Public Interest Strongly Counsel Against a Stay. 23

III. THE SCOPE OF RELIEF IS PROPERLY TAILORED TO PROVIDE COMPLETE RELIEF TO PLAINTIFFS WITH STANDING. ............... 30

CONCLUSION ......................................................................................... 34

## INTRODUCTION

Federal Defendants (USPS) and Intervenor States (Intervenors) have not made the strong showing needed to establish that the district court abused its discretion in entering a limited injunction, prohibiting USPS from refusing to deliver mail ballots from states to eligible voters for the upcoming midterm elections.

The USPS Rule at issue blocks states from sending mail ballots to eligible voters unless the states meet unprecedented voter-data and barcode-matching requirements—and unless USPS's own systems, including a web portal that does not yet exist, successfully process the submission. And it requires rejecting entire batches of ballots where just one envelope does not scan properly or otherwise comply with the Rule. But USPS "cannot exclude or refuse to deliver" mail unless "some law of Congress" authorizes it, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902), and USPS identifies no such law here. USPS cannot create a new category of nonmailable matter by fiat. The Rule is therefore ultra vires.

Nor is it the modest postal regulation Defendants claim. The Rule—explicitly described as a supposed election integrity measure—would

upend state election processes. The major questions doctrine confirms that USPS cannot invoke its general postal rulemaking authority to exercise an extraordinary power to regulate elections, never granted by Congress, by making mail ballots nonmailable. And because the Rule also makes USPS a gatekeeper between states and eligible voters, it violates the Constitution's separation of powers.

The district court's narrow injunction was well within its discretion. The injunction permits states to comply voluntarily with the Rule's envelope-design specifications and procedures for entering voter data into a yet-to-be-launched web portal, consistent with state law, while simply barring USPS from rejecting ballots for the upcoming midterm elections that do not comply with the Rule.

Defendants cannot answer the district court's detailed findings that USPS's rushed implementation of the complex, untested Rule would "nearly guarantee[] significant disenfranchisement for eligible voters," including Plaintiffs' members in every state. ECF 285 (PI) at 32-35. Uncontested evidence shows that many jurisdictions will be unable to satisfy the Rule's requirements.

Nor have Defendants shown any irreparable harm. They provide no

evidence of fraudulent mail voting or that the Rule would address this vaguely alleged problem. Indeed, they offer no evidence the Rule could deliver *any* benefit for the November elections. States cannot meet the Rule's requirements in the time remaining before they must send out ballots under state laws—a timeline USPS's own unreadiness only compresses—and any rushed compliance attempt guarantees data-entry errors and mis-scans that, under the Rule, doom ballots by the batch. Having postponed issuance of a final rule, Defendants cannot now claim the resulting proximity to the election is anything but an injury of their own making.

This Court should deny the stay motions.

## STATEMENT

### A. Executive Order and Final Rule

In March 2026, President Trump issued an Executive Order directing the Postmaster General to initiate proposed rulemaking to fundamentally alter postal practices governing mail ballots. 91 Fed. Reg. 17125, 17126.

On August 26, 2026, USPS issued the Final Rule, effective August 21, 2026, amending the Domestic Mail Manual "regarding the

transmission of mail-in or absentee ballots for federal elections." 91 Fed. Reg. 54966. Under the Rule, USPS will not deliver mail ballots to voters unless: (1) the ballot envelope meets USPS's new design standards, which election officials must submit to USPS for pre-approval; (2) the voter is on a state-specific "Mail-In and Absentee Participation List," which local election officials must create and transmit through a new Federal Mail Ballot Portal (Portal); and (3) the voter's address, unique barcode, and originating state are the same on the ballot envelope and in the Portal. *Id.* at 54991 (§§705.24.3, 705.24.5). USPS "will review" each batch of ballots (known as a "mailing," which is "a group of pieces ... that may be sorted together," while a "piece" or "mailpiece" refers to an "individually addressed" item)[1] to determine whether it meets these criteria. *Id.* If even a single ballot envelope within a mailing fails to properly scan, the entire mailing (no matter the size) will be rejected. *Id.* (§§705.24.4.2(d), 705.24.5.1, 705.24.5.3); ECF 265-1 at 10-11.

According to Tammy Patrick, an election-administration expert whose declaration the district court properly considered, PI 44 n.61,

[1] USPS, Domestic Mail Manual (DMM), 235 Mail Preparation, https://pe.usps.com/text/dmm300/235.htm [https://perma.cc/3BD8-FEGL].

USPS has *never* rejected ballots based on envelope design, refused entire ballot mailings because of a defect in a single piece, subjected ballot mailings to requirements inapplicable to other mail, or required ballot recipients to appear on a list. ECF 264-1 (Patrick Decl.) ¶¶17, 71, 94, 113.

**B. Procedural History**

On April 2, 2026, Plaintiffs challenged the Order. ECF 1. The district court preliminarily enjoined the Order on August 11. ECF 183. Intervenors appealed but voluntarily dismissed the appeal on September 4. *LWVMA v. Missouri*, No. 26-1944 (1st Cir. Sept. 4, 2026).

After the district court granted summary judgment and an injunction in a suit brought by a group of states and D.C. (the State Plaintiffs), *California v. Trump*, No. 26-cv-11581, 2026 WL 1826490 (D. Mass. June 25, 2026), the Supreme Court stayed that injunction on August 24, *Trump v. California*, No. 26A124, 2026 WL 2473573, at *1. The Court held that the claims were not ripe but explained that if "the Postal Service's final rule harms the States, they may challenge that rule." *Id.*

At USPS's request, the district court vacated its initial preliminary injunction on August 26. ECF 204. The same day, Plaintiffs filed a

Supplemental Complaint challenging the Final Rule (published that day) and sought a TRO and new preliminary injunction, ECF 205, 206.

On August 27, the district court issued a TRO partially enjoining the Rule for 14 days while it considered Plaintiffs' preliminary injunction motion. ECF 218 at 10-11. Defendants appealed the TRO and sought a stay from this Court. *See LWVMA v. Trump*, No. 26-1988 (1st Cir. Aug. 31, 2026); *LWVMA v. Missouri*, No. 26-1989 (1st Cir. Aug. 31, 2026). Though this Court had not yet ruled, USPS sought a stay from the Supreme Court but then withdrew its request on September 6. *See* Letter, *USPS v. California*, No. 26A297 (U.S. Sept. 6, 2026).

At the September 3 preliminary-injunction hearing, USPS could not say whether the Portal was ready, ECF 283 at 70:14-71:21, and later that day indicated only that it "anticipate[s] being in a position to make the Portal available to users for voluntary use by sometime next week," ECF 280-1 ¶3.

On September 4, the district court issued a preliminary injunction based on detailed factual findings. PI. The court found that the rushed and haphazard Rule rollout "guarantee[d] significant disenfranchisement for eligible voters," PI 33-34, and that logistical

difficulties throughout the process would make compliance with the Rule for the midterms "virtually impossible," *Id.* 33-44. On the merits, it found that the Rule unconstitutionally intruded on Congress's and states' powers under the Elections Clause, exceeded USPS's delegated power under the Postal Clause, and contradicted Congress's enactments regarding nonmailable material. *Id.* 31. It partially enjoined the Rule for the November elections, permitting states to voluntarily comply with the Rule's envelope standards and Portal-enrollment process, while prohibiting USPS from rejecting Rule-noncompliant ballots. *Id.* 48. Defendants appealed the PI and requested a stay pending appeal from this Court. USPS also sought a stay from the Supreme Court. *USPS v. California*, No. 26A305 (U.S. Sept. 6, 2026).

## ARGUMENT

### I. DEFENDANTS ARE UNLIKELY TO SUCCEED ON THE MERITS.

Defendants have not made a "strong showing" that the district court erred because the Rule is ultra vires and unconstitutional. *See Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted).

#### A. Plaintiffs May Sue in Equity.

Plaintiffs may proceed in equity "without a congressionally-

provided cause of action to prevent an injurious act by a public officer." *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026) (citation modified).

USPS is wrong (7) that Plaintiffs must satisfy the heightened standard described in *NRC v. Texas*, 605 U.S. 665 (2025). Constitutional claims are never subject to that standard. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952). For statutory claims, *NRC* "only applies where Congress has provided a reticulated judicial review scheme that allows injured parties a meaningful and adequate opportunity for judicial review." PI 28 n.32 (citation modified). Where, as here, Congress has provided no such scheme, *NRC* is inapposite. *E.g.*, *Cook*, 146 S. Ct. at 2251 n.2; *Learning Res., Inc. v. Trump*, 607 U.S. 229, 240 (2026); *Trump v. Illinois*, 146 S. Ct. 432, 434 (2025). Regardless, Plaintiffs satisfy *NRC* because the Rule contravenes clear and specific statutory commands.

**B. The Rule Is Unlawful.**

The text, structure, and history of the Postal Reorganization Act (PRA), 39 U.S.C. §101 *et seq.*, show that the Rule is ultra vires. USPS has no authority to promulgate the Rule, and it violates several provisions of the PRA. Specifically, USPS cannot enact regulations inconsistent with

the PRA, but the Rule does just that because it creates a new category of nonmailable matter beyond Congress's tightly circumscribed limitations on nonmailable matter. Nor is the Rule necessary for the functions of the PRA. The major questions doctrine confirms that USPS may not invoke its general rulemaking authority to claim the extraordinary and unprecedented power to dictate whether and how states may conduct elections by mail.

*1. The Rule Exceeds USPS's Authority Under the PRA.*

The Supreme Court has long recognized that the Postal Service must deliver the mail unless Congress creates an exception. While "[t]he validity of legislation prescribing what should be carried … has never been questioned," *Ex parte Jackson*, 96 U.S. 727, 728 (1877), the Postal Service "cannot exclude or refuse to deliver" mail unless "some law of Congress" authorizes it, *McAnnulty*, 187 U.S. at 109.

Congress carried that principle into the PRA. USPS must "operate[] as a basic and fundamental service," "provide postal services to bind the Nation together," "provide prompt, reliable, and efficient services to patrons in all areas," and "render postal services to all communities." 39 U.S.C. §101(a). USPS must "receive, transmit, and deliver" the mail

"throughout the United States." *Id.* §403(a). USPS has specific powers "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* §404(a)(1). Congress also created a comprehensive statutory scheme identifying particular types of matter as "nonmailable." *See id.* §§3001-3018. Thus, USPS must deliver mail unless it identifies statutory authorization permitting it not to.

The Rule violates that command. It deems mail ballots nonmailable unless states comply with its unprecedented voter-data demands and data- and barcode-matching requirements. *See* 91 Fed. Reg. 54991 (§705.24.5.3). It thus creates a new condition of nonmailability that Congress never enacted—exceeding USPS's statutory authority.

USPS (9) and Intervenors (9-11) invoke USPS's "general rulemaking powers." But those powers authorize USPS to enact rules when "necessary" to carry out its statutorily assigned "functions," to the extent "not inconsistent with this title," 39 U.S.C. §401(2), and to take "necessary" or "appropriate" actions to carry out its statutorily specified "functions" and "powers," *id.* §401(10). Because the power to define nonmailable material belongs to Congress alone, the Rule is not

consistent with the PRA. Nor does the Rule exercise rulemaking authority that is necessary to USPS's specific mail-delivery powers under §404(a)(1). This is not a mere "envelope design" or labeling rule, but a barrier to ballot transmission. And none of the powers listed in §404(a)(1) authorizes USPS to deem otherwise mailable matter nonmailable—power Congress reserved. Because the Rule is neither appropriate nor necessary, it cannot be a proper exercise of USPS's rulemaking authority.

The PRA's structure confirms USPS may not create new categories of nonmailability. Reading USPS's general rulemaking authority to permit it to create such new categories would swallow Congress's specific mailability provisions. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). And Congress's "established series" of provisions identifying nonmailable matter "necessarily bespeaks a negative implication" as to categories it omitted, *Esteras v. United States*, 606 U.S. 185, 195 (2025) (citation modified)—Congress knows how to authorize an agency to create additional exceptions to a rule, *e.g.*, 18 U.S.C. §39A(d).

The Postal Service's history also supports this. The Founders understood that the Crown's discretionary control over the mail was

"dangerous in the extreme." William Goddard, The Plan for Establishing a New American Post-Office (1774). The Constitution thus grants Congress, not the President, the power to "establish Post Offices and post Roads." U.S. Const. art. I, §8, cl. 7. When Congress formalized the Post Office in 1792, it prohibited postal officials from "unlawfully detain[ing], delay[ing], or open[ing]" the mail. An Act to Establish the Post-Office and Post Roads within the United States, §16, 1 Stat. 232, 236 (1792).

Over time, Congress specifically authorized exceptions and conditions on mailable material. *E.g.*, Act of March 3, 1797, §6, 1 Stat. 509, 512 (1797) (prohibiting wet or unwrapped newspapers); Act of June 8, 1872, §133, 17 Stat. 283, 300-01 (1872) ("poisons," "explosive materials," and other hazardous items). Congress took the same approach in the PRA. *See* 39 U.S.C. §§3001-3018.

Defendants offer several non-persuasive counterarguments.

First, USPS argues (13) that the Rule does not render mail ballots nonmailable but merely imposes "conditions on [their] acceptance." *See also* Intervenors 9-13, 16. This is a distinction without a difference. The PRA's provisions on "nonmailable matter" include some outright bans, *e.g.*, 39 U.S.C. §3001(a), but many operate by imposing conditions on

their acceptance. Section 3001(g)(1), for example, provides that matter containing a fragrance sample is "nonmailable matter" unless the sample meets certain sealing requirements. *See also, e.g.*, *id.* §3001(d). The Rule operates in precisely the same way: It treats otherwise mailable ballots as nonmailable unless states satisfy the Rule's requirements.

Second, USPS points to examples of existing postal regulations that it claims support the Rule. They do the opposite. USPS repeatedly invokes (2, 10-11, 13) regulations concerning cremated remains or replica explosives as examples of restrictions issued under its general rulemaking authority. *See also* Intervenors 11. But those regulations rest on an express grant of statutory authority, not USPS's general rulemaking powers. USPS regulates those materials in Publication 52, which governs hazardous, restricted, and perishable matter rendered nonmailable in 18 U.S.C. §1716. Publication 52 §§211, 434, 451.2; *see* 39 U.S.C. §3001(a) (incorporating 18 U.S.C. §1716).

USPS likewise invokes (13-14) regulations concerning insufficient postage and inadequate addresses. But those are generally applicable mail regulations that do not single out a particular class of mail. Regardless, Congress has specifically authorized USPS to prescribe "the

amount of postage and the manner in which it is to be paid," 39 U.S.C. §404(a)(2), establish classes of mail, rates, and fees, *id.* §404(b), and provide for the "delivery … of mail," and the "disposition of undeliverable mail," *id.* §404(a)(1).

Third, USPS claims (11) it has authority to issue the Rule to "facilitate enforcement of federal law," including mail fraud. The Rule itself cites 18 U.S.C. §3061 in support. But Section 3061(a) grants USPS postal inspectors investigative authority into "criminal matters related to the Postal Service and the mails" using warrants, arrests, and property seizures as provided by law. The Rule does not relate to any of these investigatory tools so cannot be in service of this subsection. So too for Section 3061(b), which limits postal inspectors' subsection (a) investigatory tools. This provision may authorize USPS to issue regulations related to the ability of postal inspectors to carry out criminal investigations, but it does not provide any basis to make rules related to the deliverability of mail itself.

Moreover, USPS admits (15) that it will not second-guess whether ballot recipients are eligible to vote. And because the Rule applies to election officials sending blank ballots to registered voters, USPS's

purported fraud rationale suggests that *election officials* are somehow committing fraud by helping duly registered voters vote. USPS has not explained how this could possibly relate to law enforcement. Nor could it, especially where USPS wholly fails to rebut the district court's finding that the record contained no evidence of voter fraud warranting the Rule. PI 45-46.

USPS's hypothetical elder-abuse example (11) is unavailing, as Congress delegated to USPS the specific authority to regulate the mailability of matter that: "constitutes a solicitation for the purchase of or payment for any product or service that— (i) is provided by the Federal Government; and (ii) may be obtained without cost from the Federal Government," 39 U.S.C. §3001(j); "is in the form of, and reasonably could be interpreted or construed as, a bill, invoice, or statement of account due" but is actually a solicitation, *id.* §3001(d); and deals with sweepstakes contests unless it meets a series of requirements and disclaimers, *id.* §3001(k).

Finally, USPS contends (12) that Plaintiffs' position means that USPS lacks any authority to regulate election-related mail. Not so. USPS may regulate election-related mail, like other mail, with statutory

authorization. *See, e.g.*, Mailing Standards of USPS, DMM (§703.8.2.1-2) (specifying the class of outbound and return ballot mail); 39 U.S.C. §404(b) (authorizing USPS to "establish reasonable and equitable classes of mail"). But USPS may not *reject* election-related mail based on category-specific requirements absent congressional authorization. USPS's other examples (12-13) of "election-mail specific rules" do not establish otherwise because they are voluntary: USPS does not reject ballots that fail to follow them and thus complies with its mandate to deliver the mail.

*2. The Major Questions Doctrine Confirms the Rule Is Unlawful.*

USPS claims not only authority to decide what is mailable, but also the unprecedented authority to alter election administration by refusing to deliver mail ballots that states send their eligible voters. As is their sovereign prerogative, every state authorizes at least some residents to vote by mail. *Watson v. RNC*, 146 S. Ct. 2165, 2169-71 (2026). But USPS now claims it is empowered to condition its delivery of election mail on generic and unrelated grants of authority. This assertion of federal power over state election processes lacks the explicit, unambiguous authorization the major questions doctrine requires.

USPS (1-2, 4, 7, 13-15) and Intervenors (1-5, 9) repeatedly characterize the Rule as a "modest" regulation of the mail. It is anything but. The Rule dictates conditions under which states may send ballots to their citizens, directly affecting how millions exercise the franchise. And the general grants of authority USPS relies on supply no limiting principle. USPS does not explain what election-related conditions it may impose, what standards govern those conditions, how close to an election they may take effect, or how much compliance burden USPS may impose.

The claimed power thus intrudes on election administration, "an area that is the particular domain of state law," *see Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021); *cf. Pub. Interest Legal Found., Inc. v. Bellows*, 92 F.4th 36, 51 (1st Cir. 2024) (requiring a showing of "the clear and manifest purpose of Congress" to displace states' "historic police powers" (citation omitted)). Contrary to Intervenors' arguments (13-14), the Rule's vast political significance—impacting millions of ballots—triggers the major questions doctrine irrespective of its economic impact. *West Virginia v. EPA*, 597 U.S. 697, 743 (2022) (Gorsuch, J., concurring) ("[T]he doctrine applies when an agency claims the power to resolve a

matter of great political significance." (citation modified)).[2]

The Supreme Court has long expressed "reluctan[ce] to read into ambiguous statutory text extraordinary delegations of Congress's powers." *Learning Res.*, 607 U.S. at 242 (citation modified). That principle applies with particular force where the asserted delegation implicates a "core congressional power." *Id.* at 243. The asserted authority here concerns both election regulation and the federal postal system, U.S. Const. art. I, §§4, 8, cl. 7—powers that Congress has zealously guarded, *see Hannegan v. Esquire, Inc.*, 327 U.S. 146, 156 n.18 (1946) (Congress has "zealously watched and strictly confined" its "power" over nonmailable matter); *LULAC v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 73 (D.D.C. 2025) ("Congress has closely guarded its Elections Clause powers.").

The Rule's "lack of historical precedent" also implicates the doctrine. *Learning Res.*, 607 U.S. at 245-46. There are many examples of USPS invoking *some* statutory authority—even if odious or constitutionally suspect—to justify past attempts to exclude mail, *e.g.*,

[2] Undisputed State Plaintiffs' declarations also speak to the serious financial strain the Rule causes. *See, e.g.*, Southard Decl. ¶60, *California v. USPS*, No. 26-cv-13917 (D. Mass. Aug. 26, 2026), Dkt. No. 4-1.

*U.S. ex rel. Milwaukee Soc. Democratic Publ'g Co. v. Burleson*, 255 U.S. 407 (1921) (defending exclusion under Espionage Act of 1917), but USPS identifies no precedent where it *unilaterally* created a new category of nonmailable matter. Nor has USPS identified any other instance in which it invoked its general delivery authority to impose conditions on ballot mail—because the Rule is "unprecedented." *See* Patrick Decl. ¶¶17, 71, 94.

USPS must "identify clear congressional authorization." *Learning Res.*, 607 U.S. at 255. It does not, and the statutes it relies on are nowhere near clear enough to sustain its extraordinary assertion of power.

**C. The Rule Is Unconstitutional.**

The Rule is also unconstitutional because it intrudes on states' sovereign authority to administer elections. While the Elections Clause empowers *Congress* to check states' authority to run federal elections, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013), the Constitution gives no such power to the *Executive Branch*. The Rule therefore violates the constitutional separation of powers.

USPS argues (15-16) that constitutional challenges against the Rule collapse into statutory ones because if Congress authorized the

Rule, it is neither ultra vires nor an Elections Clause violation. *See also* Intervenors 14. But Congress did not authorize the Rule—instead, it is USPS's unprecedented attempt to intrude into election administration. The Constitution gives states and Congress the power to decide when and how elections unfold; nowhere does it include a federal agency acting without due authority.

USPS claims (15) that the Rule does not regulate elections, only the mail. But the Executive Order that spawned the Rule, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections," states its purpose is to "enhance election integrity via the United States Mail." 91 Fed. Reg. 17125. And the Rule itself invokes "the need … [to] help protect the integrity of federal elections." *Id.* at 54966.

USPS's argument (11) that the Rule "regulates only how States must design and label the envelopes they send via U.S. mail" ignores that the Rule requires USPS to reject mail ballots unless the voters to whom they are addressed are enrolled with USPS "on the state's Mail-In and Absentee Participation List, consistent with the technical specifications for the Federal Ballot Mail Portal." 91 Fed. Reg. 54991 (§705.24.5.1). "Mailings that do not comply ... *will not be accepted* and *will be returned*

to the authorized ballot mailer." *Id.* (§705.24.5.3(a)) (emphasis added). USPS is not merely regulating mail but imposing conditions on states' ability to conduct elections by mail. Indeed, because it controls access to the Portal, USPS could freely dictate the states' compliance with election deadlines or even their ability to use mail voting at all.

## II. THE REMAINING FACTORS WEIGH AGAINST A STAY.

### A. Defendants Have Not Established Irreparable Harm.

Defendants have not shown they are likely to suffer irreparable harm at all, let alone an injury that merits emergency action. *See Nken*, 556 U.S. at 434.

First, Defendants cannot be "irreparably harm[ed]" by an order restraining unlawful or unconstitutional conduct. *Cf. Abbott v. Perez*, 585 U.S. 579, 602 (2018). USPS's reliance (17) on the Supreme Court's prior stay is misplaced. There, the injunction restricted what the Supreme Court described as the Executive Branch's internal communications; here, the asserted harm is the inability to implement an unlawful policy. *See California*, 2026 WL 2473573, at *1. Frustration of policy preference does not warrant a stay absent likely success on the merits. *E.g.*, *Biden v. Texas*, 142 S. Ct. 926 (2021) (mem.); *New Jersey v. Trump*, 131 F.4th

27, 41 (1st Cir. 2025).

Second, Defendants have not made the requisite factual showing of harm. As the district court found, there is no record evidence of fraudulent mail voting, PI 45-46, much less evidence of how the Rule would address this unsupported problem. Instead, USPS makes the unsupported claim (17-18) that the PI impedes its "ability to implement the Rule's beneficial practices for upcoming ballot mailings," including "visibility and law enforcement benefits." Damningly, it never engages with the substantial evidence of chaos the Rule will cause for the November elections, which undercuts the claim that its implementation would be beneficial at all. Intervenors fare no better, offering only the vague assertion (22) that they will lose "election integrity measures they lack the ability to implement on their own," without offering any evidence demonstrating the lost benefit.

Defendants' arguments are particularly unavailing where the PI retains states' ability to comply voluntarily, enjoining only USPS's rejection of ballots, and where record evidence shows USPS cannot even implement the Rule in a manner (*infra* §II.B) or on a timeline to enable states to comply, voluntarily or otherwise. USPS has stated only that as

of September 3, it "anticipate[s] being in a position to make the Portal available to users for voluntary use by sometime next week," ECF 280-1 ¶3, and it has not explained how it will simultaneously complete the required review of the envelope design for *thousands* of jurisdictions, which the Rule mandates must occur *prior* to uploading any data in the Portal. 91 Fed. Reg. 54989.

Finally, USPS cannot insist that judicial review before the Rule issued was premature, ECF 128, and then invoke (16) the resulting proximity to the election as an injury, especially when USPS controlled the timing of the Rule's publication and issued the Rule less than 70 days before the election, over states' warnings that they lacked enough time to implement it.

### B. The Equities and Public Interest Strongly Counsel Against a Stay.

The balance of equities starkly favors maintaining the PI. Defendants cannot show that a stay will not "substantially injure" the other parties and that it serves the public interest, *Nken*, 556 U.S. at 426, which strongly favors protecting the fundamental right to vote, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

Voting by mail is a critical feature of U.S. elections. *See* PI 32-34

n.37 (State Plaintiffs alone anticipate sending more than 50 million ballots for November elections). But under the Rule, USPS's time-intensive, error-prone scanning and verification process will reject ballots by the batch. The PI thus serves the public interest in several ways. It comports with federalism and the Elections Clause by preserving longstanding mail-voting regimes, while leaving states free to participate voluntarily in the Rule's envelope-design and Portal procedures. *See supra* §I. It preserves access to the franchise for eligible voters nationwide who have no method other than mail ballots to participate in the electoral process. *See infra* §III. And it protects the ability of nonpartisan voter-service organizations like Plaintiffs to conduct their core activities. *See id*.

On the other side of the ledger, Intervenors argue (22-23) solely that it is in the public interest to enforce a valid law, but the district court properly concluded that the Rule is not valid, *see supra* §I, and "there is generally no public interest in the perpetuation of unlawful agency action," *Rhode Island v. Trump*, 155 F.4th 35, 50 (1st Cir. 2025) (citation omitted). Far from USPS's suggestion (18) that the State Plaintiffs provided only "bald assertions about difficulties they might face" in

implementing the Rule, the district court rested its conclusion that the equities favored a PI on detailed factual findings that the states would be "unable to pivot this late in the election cycle" to comply with the Rule, "nearly guaranteeing significant disenfranchisement for voters." PI 32-34; *see also* Patrick Decl. ¶¶21-122 (detailing "extraordinary complexity of election administration" and the logistical challenges that render Rule-compliance "effectively impossible"); ECF 264 at 4-7.

The district court highlighted the practical limitations of the Rule's envelope-design requirements, relying on detailed, unrebutted testimony from dozens of state officials demonstrating that it cannot be implemented in a manner or timeline to enable states to comply for November: States *inter alia* did not yet have barcodes on their envelopes, could not print them themselves and/or were told by vendors that rush-printing new envelopes in time was impossible. PI 34-35. Relatedly, the district court found the "only" record evidence was that USPS historically takes "weeks or months" to review such designs, not to mention the time necessary to conduct the unprecedented "simultaneous review of hundreds or thousands of ballot envelopes." *Id.* 36-38.

The district court also found that the mandatory process of enrolling tens of millions of voters via USPS's Portal—where barcodes may need to be manually entered whenever the currently inaccessible Portal comes online—imposes an "overwhelming expenditure of time by election officials," across *10,000* election jurisdictions, none of whom have been trained but all of whom would be required to constantly update the Portal as new registrations and requests occur up to Election Day.[3] *Id.* 38-40 & n.48, 44. For that reason, State Plaintiffs "all characterized uploading voter data to the portal for the midterms as a massive undertaking and seriously doubt their ability to do so." *Id.* 40. The court found this infeasibility was exacerbated by the Rule's scanning process, which is also likely to cause severe delays and prevent timely delivery: Scanning will "compound[] to substantial time for States with large mailings," such as California's 23 million ballots. *Id.* 42; Patrick Decl. ¶¶115-19 (detailing scanning delays); ECF 264-2 (Suppl. Patrick Decl.) ¶¶10-11.

---

[3] *E.g.*, Stavisky Decl. ¶36, *California*, No. 26-cv-13917, Dkt. No. 4-17 (noting that USPS has not committed to training election officials or providing a timeline for access to the Portal for officials to learn).

The Rule's zero-tolerance approach heightens these collective threats of disenfranchisement where entire batches of ballots will be rejected if a single envelope is mis-scanned or otherwise deemed noncompliant. *See supra* at 4; 91 Fed. Reg. 54991. The required barcode also has a notoriously "low scan rate," PI 36, meaning large ballot mailings will likely be rejected based on pure probability, Patrick Decl. ¶114, to say nothing of the data-entry errors that will result from a novel, harried process. Yet despite all the ways that the Rule's implementation could go awry—where "any minor malfunction will result in the denial of mail ballots," USPS has not trained its own employees[4] or issued any "contingency plan[s]." PI 41, 45; Suppl. Patrick Decl. ¶11.[5]

---

[4] According to the head of the Postal Union, no postal clerk has yet been trained on implementation of the Rule, let alone election officials, *see, e.g.*, Eileen Smith, *Postal Service Is Building Ballot Screening System Despite Ongoing Court Fight*, N.Y. TIMES (Sept. 2, 2026), https://www.nytimes.com/2026/09/02/us/politics/postal-service-ballot-screening-system.html.

[5] According to a whistleblower report submitted to the U.S. Senate, the new USPS systems implementing the Rule also face potential "catastrophic failure" due to "rushed implementation, unclear requirements, and no meaningful testing." Anonymous Whistleblower Disclosure to Sen. Blumenthal at 2, 4, 7 (Aug. 30, 2026), available at https://www.blumenthal.senate.gov/imo/media/doc/2026-08-31_final_letter-disclosure.pdf [https://perma.cc/4D8N-9CCF]. That report details that implementation of a project of this scope typically takes 9 months to a year—but USPS began creating the necessary infrastructure

USPS notes (18-19) that a handful of Intervenor States "have never argued that it would be impossible to comply with the rule." Yet, tellingly, none of those states submitted declarations, let alone testified about the feasibility of implementation.[6] USPS also cites (18) a media statement that the North Carolina Board of Elections is confident that the mail voting process "will happen flawlessly and smoothly." But local officials—not the State Board—are responsible for administering elections and sending out mail ballots in North Carolina. PI 16. North Carolina itself has submitted a sworn declaration stating that the Rule "will imminently cause significant harm, confusion, and disruption in North Carolina election administration" and "threaten to disenfranchise voters." Brunton Decl. ¶¶9, 12, *California v. USPS*, No. 26-cv-13917 (D. Mass. Aug. 26, 2026), Dkt. No. 4-18. USPS's claim (19) that 2 of the 23 State

---

only in June 2026. *Id.* 3, 6. The rushed process "deviate[d] dangerously from even the most basic software development best practices," with work product that is only "minimally tested." *Id.* 6, 9. The result is a process that "could prevent states from mailing enormous numbers of ballots." *Id.* 10-11.

[6] The sole Intervenor to submit a declaration, Missouri, stated only that, "[a]lthough [his] staff are still figuring out some details of implementation," he "believe[s] it is possible to implement this Rule for the 2026 General Election," ECF 234-1 ¶5; the district court found that this "comparative generality" did not rebut the submissions of the State Plaintiffs. PI 23 n.29.

Plaintiffs (New Jersey and Illinois) did not attest that compliance with the Rule would be impossible is mere semantics: Declarations from election officials in both states indicated that they have "profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election." Barber Decl. ¶15, *California*, No. 26-cv-13917, Dkt. No. 4-15; Michalowski Decl. ¶16, *California*, No. 26-cv-13917, Dkt. No. 4-24.

Collectively, these established obstacles create an imminent, substantial risk of disenfranchisement if the injunction is stayed. *See, e.g.*, PI 43-44. This near-certain disruption of the voting process is contrary to the public interest, which favors ensuring "an unhampered, unconditioned vote." *Mancuso v. Taft*, 476 F.2d 187, 193 (1st Cir. 1973). Therefore, the district court properly determined that a PI was warranted when, in balancing harms "based on the record," it found "on one side, that immediate implementation of the Final Rule issued less than seventy days before the November 2026 election threatens disenfranchisement of millions of United States citizens who seek to vote by mail, and on the other side," there is "no evidence relating to

fraudulent mail voting to support the rushed implementation of the Final Rule." PI 45-46.

## III. THE SCOPE OF RELIEF IS PROPERLY TAILORED TO PROVIDE COMPLETE RELIEF TO PLAINTIFFS WITH STANDING.

The PI is appropriately tailored to offer "complete relief *to the plaintiffs before the court*." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025). The district court correctly held that Plaintiffs have standing based on factual findings that the Rule threatens their members and core voter-engagement activities. PI 21-24.

As to associational standing, Plaintiffs' millions of members span every state and include rural, elderly, disabled and indigenous voters who must vote by mail because they lack transportation; voters who require language assistance unavailable at the polls; out-of-state college students who cannot return home in time; and people serving as poll workers on election day—all of whom face a substantial risk of being unable to vote. *See* 3d Stewart Decl. ¶11, ECF 208-1; 3d Nguyen Decl. ¶13, ECF 208-3; 3d Washington Decl. ¶¶32, 33, 48, ECF 208-5; 3d Canavan Decl. ¶59, ECF 208-4. This includes members who reside in states not represented by the State Plaintiffs. *See* 3d Stewart Decl.

¶¶41-43, 45-46; 3d Nguyen Decl. ¶¶3-7, 13, 33-36; 4th Stewart Decl. ¶¶2, 5, 7, ECF 251-1.

Defendants' depiction of the disenfranchisement threat as "speculative" (USPS 20; Intervenors 2, 8) is unfounded. The record provides "granular detail," PI 23 n.29, from nearly half of the states' election officials showing that "it is likely impossible to comply with the Final Rule for the midterm[s]," *id.* 23-24, given the compressed time to meet its requirements, *see id.* 34-36.

Intervenors' assertion (8) that there is no "evidence that States will not comply," and that compliance is "certainly [their] intent," is both factually incorrect, *see supra,* and beside the point. Election officials have said that compliance is impossible, not that they will refuse to try. But even assuming full compliance, Plaintiffs' members still face substantial risk of disenfranchisement, given the high likelihood that batches of thousands of ballots will be rejected due to the Rule's rushed rollout and zero-tolerance verification regime. *See supra* at 4. Unlike *Clapper v. Amnesty International USA*, 568 U.S. 398, 414 (2013), there is no uncertainty here about future government action. The court properly concluded "disenfranchisement of Plaintiff organizations' members is

unavoidable rather than hypothetical for this upcoming election." PI 43-44.

As to organizational standing, the Rule directly impairs Plaintiffs' core voter-engagement activities. Relying on extensive testimony, the district court found "[t]he chaos engendered by the Final Rule's immediate deadlines is significantly interfering with Plaintiff Organizations' mission to provide its members with accurate and reliable information about how to vote, including by mail," leading to confusion about "whether to advise their members to vote by mail, despite legal entitlement, due to the high risk of disenfranchisement." PI 22 & nn.27-28. Where, as here, organizations are dedicated to assisting voters, government action that directly interferes with that work causes cognizable injury. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). That the cause of the interference is government-created chaos does not render it any less concrete under Article III. *Cf.* Intervenors 8; *see, e.g.*, *Get Loud Ark. v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026); *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024).

Contrary to USPS's (21) and Intervenors' argument (7-8), *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) (*AHM*), "is not a useful analogue to this case." ECF 175 at 8. *AHM* rejected standing based on a "setback to the organization's abstract social interests" and advocacy expenditures to oppose a government policy. 602 U.S. at 394-95. Plaintiffs' standing depends on neither. Their missions are harmed by the Rule's interference with voter-assistance activities central to their operations. The resources required to address that interference are due to the Rule's impact on those activities, not expenditures undertaken to oppose it. *See* ECF 175 at 8.

The scope of this harm necessitates the PI's breadth. "As assessed by an expert in election administration, as to all States, '[n]one of the rules' requirements can feasibly be implemented before the November 3, 2026, General Election.'" PI 44 (citation omitted). Based on unrebutted evidence, the court "conclude[d] that disenfranchisement for Plaintiff Organizations' members, regardless of residence, is practically inevitable." PI 45. Geographically narrower relief therefore could not protect Plaintiffs: Their members vote by mail everywhere, and they need to assist their members in every state to exercise that right.

Nor does Intervenors' assertion (23-24) regarding the PI's alleged impact on states that wish to "*voluntarily* follow" the Rule support narrowing the relief. The PI neither extends beyond November 2026 nor prevents states from voluntary compliance with most of the Rule's provisions, insofar as they are consistent with their own laws. PI 46-48. The only mandatory prohibition that extends to all 50 states prevents USPS from rejecting ballot mail that does not comply with the Rule's requirements. PI 47-48. No state has a legitimate interest in the rejection of mail ballots that comply with its own laws, and a narrower order could not afford Plaintiffs the requisite "complete relief." *CASA*, 606 U.S. at 851-52 & n.12.

## CONCLUSION

The Court should deny the motions for a stay.

Dated: September 7, 2026

Respectfully submitted,

/s/ Sophia Lin Lakin

Sophia Lin Lakin
Theresa J. Lee
Davin Rosborough
Ethan Herenstein
Jonathan Topaz
Ming Cheung
William Hughes

Jessie J. Rossman
Suzanne Schlossberg
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108

Eliza Sweren-Becker
Wendy Weiser
Andrew B. Garber
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271

Justin Lam
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001

Niyati Shah
Noah Baron
Ejaz Baluch, Jr.
ASIAN AMERICANS ADVANCING JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036

Miranda Galindo
Latino Justice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Sarah Brannon
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005

Leah C. Aden
Brenda Wright
John S. Cusick
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

I. Sara Rohani
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This opposition to Defendants' motions for an administrative appeal and a stay pending appeal contains 6,498 words. On September 5, 2026, USPS filed a motion for an administrative stay and a stay pending appeal. On September 6, 2026, Intervenors also filed a motion for an administrative stay and a stay pending appeal. Rather than file two separate oppositions of 5,200 words each in accordance with word limit of Federal Rule of Appellate Procedure 27(d)(2)(A), Plaintiffs' counsel conferred with counsel for Defendants and Intervenors regarding the submission of a single, combined opposition of no more than 6,500 words. Defendants and Intervenors do not oppose this request. As a result, simultaneous with the filing of this opposition, Plaintiffs have filed an unopposed motion for leave to file a combined opposition of no more than 6,500 words. The motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared using proportionally spaced 14-point Century Schoolbook typeface.

Dated: September 7, 2026

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin

**CERTIFICATE OF SERVICE**

I hereby certify that this document is served on today's date to all registered users of the court's e-filing system who have appeared in this case by the court's electronic filing system.

Dated: September 7, 2026

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin